# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

AMERICAN FEDERATION OF )
GOVERNMENT EMPLOYEES, )
AFL-CIO, )
)
    Plaintiff, )
)
    vs. )    Civil Action No. 1:18-cv-1230
)
EUGENE HUDSON, JR., )
an individual, )
)
    Defendant. )


**DEFENDANT EUGENE HUDSON'S MEMORANDUM OF POINTS AND
AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND DEFENDANT'S MOTION TO DISMISS
PLAINTIFF'S CONVERSION CLAIM**

# TABLE OF CONTENTS

INTRODUCTION…………………………………………………………………………...1

BACKGROUND………………………………………………………………………………..2

MATERIAL FACTS IN DISPUTE……………………………………………………………….3

    The James Spreadsheet………………………………………………………………………3

    The Sharp Spreadsheet…………………………………………………….......13

    AFGE's Policies……………………………………………………………………13

    From 2015 through 2019, AFGE did not make its membership aware of its written policies………………………………………………………………………………...15

LEGAL ARGUMENT………………………………………………………………………...16

I.       This Court lacks jurisdiction to hear Plaintiff's LMRDA claims…………………………16

II.     This Court should dismiss or deny summary judgment on AFGE's claim that Hudson misappropriated AFGE's trade secrets……………………………………………17

         A.     Genuine issues of material fact exist as to whether AFGE's Member Data constitutes a trade secret…………………………………………..…..17

                 1.     AFGE's Member Database is not secret…………………………....17

                 2.     The Member Database does not derive value from its secrecy because it is not "secret"……………………………………………20

                 3.     AFGE failed to use reasonable efforts to secure the Member Database……………………………………………………………22

         B.     Genuine issues of material fact exist as to AFGE's claim that Hudson "misappropriated" the Member Data……………………………...23

III.    This Court should deny summary judgment on AFGE's conversion claim, or in the alternative, dismiss the conversion claim as moot. …………………………...32

         A.     Hudson was initially in lawful possession of the information contained in the spreadsheets………………………………………………………32

                 1.     The James Spreadsheet……………………………………………..33

                 2.     The Sharp Spreadsheet……………………………………………..34

**TABLE OF CONTENTS, continued**

B.     Because Hudson was initially in lawful possession of the information
in the James and Sharp Spreadsheets, it was incumbent upon AFGE to
demand that Hudson return the information—which he did................35

IV.   This Court should dismiss or deny summary judgment on AFGE's claims that
Hudson violated his fiduciary duties to AFGE and dismiss all claims
against him………………………………………………………………….....40

CONCLUSION…………………………………………………………………………..44

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                                 Page(s)

*Catalyst & Chemical & Chemistry Services, Inc. v. Global Ground Support*,
    350 F. Supp. 2d 1 (D.D.C. 2004)………………………………………………19, 29

*De Lupis v. Bonino,* No. 07-01372 (RBW), 2010 U.S. Dist. LEXIS 31198
    (D.D.C. March 31, 2010)………………………………………………………….32, 35

*Dimondstein v. American Postal Workers Union*,
    964 F. Supp. 2d 37 (D.D.C. 2013)…………………………………….…..2-4, 15, 17,
                                      21-22, 25, 30, 38, 41
*DSMC, Inc. v. Convera Corp.*,
    479 F. Supp. 2d 68 (D.D.C. 2007)……………………………………………..17-18, 29

*Dunlop-McCullen v. Pascarella*, No. 97 Civ. 0195(PKL)(DFE),
    2002 WL 31521012 (S.D.N.Y. Nov. 13, 2002)……………………………………….43

*Fleming v. Bronfin*, 80 A.2d 915 (D.C. Cir. 1951)…………………………………….10, 26

*Furash & Co. v. McClave,* 130 F. Supp. 2d 48 (D.D.C. 2001)……………………....32, 35-36, 44

*Greenpeace, Inc. v. Dow Chem. Co.*, 97 A.3d 1053 (D.C. Cir. 2014)…………………..…39

*HIRECounsel D.C., LLC v. Connolly*, No. CV 20-3337 (EGS),
    2021 WL 5998365 (D.D.C. Dec. 20, 2021)…………………………………………26-27

*Johnson v. McCool,* 808 F. Supp. 2d 304 (D.D.C. 2011)…………………………………......32

*Pearson v. Dodd*, 410 F.2d 701 (D.C. Cir. 1969)…………………………………….…..39

*Saunders v. Hankerson*, 312 F. Supp. 2d 46 (D.D.C. 2004)……………………………….43-44

*Search v. Uber Techs., Inc.*,
    128 F. Supp. 3d 222 (D.D.C. 2015)……………………………………….…..10, 26

*Schecter v. Merchants Home Delivery, Inc.*,
    892 A.2d 415 (D.C. Cir. 2006)……………………………………………….10, 26

*Shea v. Fridley,* 123 A.2d 358 (D.C. Cir. 1956)………………………………………35

*Temple Univ. Hosp., Inc. v. NLRB*, 929 F.3d 729 (D.C. Cir. 2019)……………………..16

**TABLE OF AUTHORITIES, continued**

<u>Statutes</u>                                                                                            Page(s)

Labor Management Reporting and Disclosure Act (LMRDA)
      § 401(c), 29 U.S.C.S. § 481(c)……………………………………………………...2

Labor Management Reporting and Disclosure Act
      29 U.S.C. § 501…………………………………………………………………..40, 42-45

<u>D.C. Code</u>

D.C. Code § 36-401……………………………………………………………17, 19, 22, 29

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Civil Action No. 1:18-cv-1230 |
| EUGENE HUDSON, JR., an individual, | ) ) ) | |
| Defendant. | ) ) | |

### DEFENDANT EUGENE HUDSON'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S CONVERSION CLAIM

### INTRODUCTION

In its persistent attempt to excoriate Defendant Eugene Hudson, Jr. ("Hudson" or "Defendant"), Plaintiff American Federation of Government Employees ("AFGE" or "Plaintiff") violated Defendant's rights to use AFGE members' email addresses to send out literature in his campaign for AFGE National President and brought false and defamatory charges against Hudson for using email addresses of AFGE members that he lawfully obtained. Like other AFGE members who were campaigning for national elected positions, Hudson used email addresses of AFGE members provided to him by AFGE members and employees who had lawful access to that information. Because Hudson lawfully obtained the email information from the Member Database, he did not "misappropriate trade secrets," "convert" AFGE property, or violate his fiduciary duty as a union officer in November 2017.  When AFGE demanded in August 2018 that Hudson return the information, he did so.  AFGE's motion for summary judgment that Hudson misappropriated AFGE's trade secrets, converted its Membership Database, and violated his fiduciary duties as an

AFGE elected officer in November 2017 should be denied because there exist genuine issues of material facts regarding those claims. In the alternative to denying AFGE's motion for summary judgment on its conversion claim, that claim should be dismissed as moot.

## BACKGROUND

For years, the AFGE National Constitution (AFGE Constitution) has been *silent* as to the use of emails to distribute campaign material upon the reasonable request of a candidate. [Declaration of AFGE General Counsel David Borer, December 20, 2017 (Borer Decl.), at p. 1]

In 2013, in *Dimondstein v. American Postal Workers Union*, U. S. District Court Judge Colleen Kollar-Kotelly ruled that candidates in a union election have a right under the Labor Management Reporting and Disclosure Act (LMRDA) § 401(c), 29 U.S.C.S. § 481(c), to send their campaign literature to all union members in a union's email database, at their own cost, if the union already maintains a membership email database that could be used to send the literature without financial or administrative burden. *Dimondstein v. Am. Postal Workers Union*, 964 F. Supp. 2d 37, 39 (D.D.C. 2013). The Court wrote:

> … Read as a whole, this [U.S. Department of Labor] guidance makes clear that while that there is no *per se* rule requiring unions to distribute via e-mail, <u>a union must still abide by reasonable candidate requests to use alternative forms of distribution (such as e-mail) if the union uses these alternative forms to disseminate information to its members</u>.

*Id.* at 43-44 (emphasis added).

As early as 2013, then, AFGE knew or should have known about the *Dimondstein* ruling requiring AFGE to grant all candidates for elected office the ability to send their campaign materials to all 310,000 AFGE members via email (as well as through the U.S. Postal Service). Yet, AFGE delayed for *four years* after the *Dimondstein* ruling**,** waiting until March 2017 before adopting such a policy. *(Exh.1: Declaration of AFGE General Counsel David Borer,*

*December 20, 2017 (Borer Decl.), at p. 2*) As he was entitled to under *Dimondstein*, Hudson

asked AFGE to provide him with the emails for use in his 2018 campaign in January 2017.

AFGE refused but provided the emails to other candidates in April 2017. On November 28,

2017, Hudson filed a lawsuit in related case 17-2543 *Hudson v. AFGE* (KBJ) seeking to obtain

the emails. AFGE did not provide them to Hudson until February 2018. *(Exh. 2: Declaration of

Eugene Hudson*, *dated June 30, 2022(Hudson Decl.)* Prior to the 2013 *Dimondstein* ruling,

AFGE routinely provided mailing labels containing the names, addresses, and telephone numbers

of its members to AFGE candidates to send out their campaign material, including Hudson who

successfully ran for elected national AFGE office in five consecutive elections.

## MATERIAL FACTS IN DISPUTE

*The James Spreadsheet*

Defendant Ryan Gurganious ("Gurganious") is an AFGE Member and an elected AFGE

Local 3509 official. In June 2015, Gurganious was running for the position of Chair of AFGE's

YOUNG Committee. In response to Gurganious' request, on or around June 6, 2015, AFGE

Field Services Department official Cara James sent an email to her personal email address with

an attached spreadsheet containing email addresses of approximately 5,597 AFGE members

("James Spreadsheet") and forwarded them to Gurganious. _Id._ AFGE points to this as evidence

of a sinister motive on James' part. However, Defendant disputes this. From June 2015 until

December 2016 when AFGE adopted the Computer Usage Policy, it was AFGE's policy to

permit **all** AFGE staff and officers to work on AFGE matters using their personal email

accounts. *Id.* AFGE allowed this practice because many AFGE staff members and officers

preferred not to use the AFGE email system, believing that using their work email accounts

permitted AFGE to monitor their emails and invade their privacy. *Id.* In fact, District 12 NVP

George McCubbin voted against changing the practice for that very reason. *Id.* Gurganious supported Defendant Dana Duggins in her 2015 campaign for National President. Gurganious used the James Spreadsheet to send three email bursts to AFGE members promoting his and Duggins' 2015 campaigns.

AFGE acknowledges that "the Member Database…like all AFGE resources, must not be used to promote internal political campaigns, *outside of certain limited and well-defined circumstances authorized by AFGE.* AFGE's Memorandum in Support of Its Motion for Summary Judgment, ECF 72-1, "Mot for S.J." at 7. Those limited and well-defined circumstances were present in June 2015 when in compliance with the *Dimondstein* dictates and 18 months before AFGE adopted formal PII and Computer Usage Policies, AFGE employee Cara James provided AFGE member Ryan Gurganious with the James Spreadsheet.

AFGE claims in the Amended Complaint that "James's unauthorized disclosure of the AFGE Member Database information does not constitute a voluntary disclosure by AFGE." Amended Comp'l ¶ 53. AFGE claims it "does not permit candidates for AFGE office to obtain member email addresses themselves and that candidates are permitted to request a set of labels to conduct mailings, or to request and pay for an AFGE-assigned vendor to set up and send out emails for the candidate." AFGE alleges that James was not authorized to provide the database to Gurganious for campaign purposes. However, this fact is disputed because Gurganious has consistently claimed that AFGE, through its employee, Cara James, gave him the database in response to his request to use them in his and Duggins' 2015 campaigns. If the jury finds, as Gurganious claims, that Cara James was authorized to provide Gurganious with the emails for use in his and Duggins' 2015 campaigns, nothing in the AFGE Constitution or in AFGE's

written policies prohibited Gurganious from later providing the same emails to Duggins and Hudson for use in their 2018 campaign for AFGE office.

   In 2019, AFGE conceded that Gurganious and Duggins did **not** "steal" or convert the Membership Database or misappropriate AFGE's trade secrets. On September 11, 2019, AFGE entered into a Settlement Agreement with Defendant Gurganious, dismissing all charges filed in this case against Gurganious.  As part of the Settlement Agreement, AFGE, through its counsel, Gony Goldberg, initially asked through his then-attorneys Jon Axelrod and Justin Keating that Gurganious include a statement in the Settlement Agreement admitting that he "violated federal law" by obtaining the 6000 AFGE membership emails from James; that "using AFGE's resources originally obtained for union business but instead used for campaign purposes was wrong;" and that Gurganious "is sorry for sending out the emails and the trouble this has caused, and apologizes for doing so."  *(Exh. 3: Email Exchange among Goldberg, Axelrod and Keating, January 7- April 3, 2019)*  Gurganious refused to sign the Settlement Agreement containing these proposed admissions, insisting that "he never believed anything he did was illegal, and he is not admitting that it was.  If he misunderstood AFGE's restrictions, this is not something he should have to apologize for any more than AFGE should apologize for its staff not being more clear about it."  *Id.*  AFGE agreed and struck the proposed admissions from the executed Settlement Agreement.  AFGE also agreed to Gurganious' demand that AFGE permit him to retain his AFGE membership, run for and hold elected AFGE office, and serve as an elected delegate to the recent June 2022 AFGE National Convention.  Surely, AFGE would not allow an AFGE member whom it deemed to be guilty of computer fraud and abuse, conversion, misappropriation of union trade secrets,  and violating his fiduciary duties to the union to continue to serve as an AFGE member and elected AFGE official.

After dismissing all charges against Gurganious, AFGE entered into a September 21, 2020, Settlement Agreement with Defendant Duggins in which AFGE dismissed all charges against Duggins.  Like AFGE's agreement with Gurganious, the Duggins/AFGE Settlement Agreement omits all language that Duggins unlawfully accepted the 6000 AFGE membership emails and used them in her 2015 and 2018 election campaigns, or that Duggins unlawfully deprived AFGE of its property and resources. And like Gurganious, Duggins did not agree to AFGE's demand that Duggins apologize to AFGE for using the Membership Database that Gurganious obtained from James to send out her 2015 and 2018 campaign materials. While AFGE settled all claims against Gurganious and Duggins, AFGE has refused to settle its claims in this case against Defendant Hudson.  Duggins attests that she believes that AFGE is treating Hudson, who is African American, in a racially disparate manner as compared with its more favorable treatment of herself and Gurganious, who are Caucasian American.  *(Exh. 4: Declaration of Dana Duggins, dated August 21, 2021 (Duggins Decl.)* Because AFGE dismissed all charges against Duggins and Gurganious for using the emails that Gurganious obtained from James in 2015 in 2017 and 2018 when Duggins ran for office with Hudson, the Court should dismiss all of AFGE's claims against Hudson as AFGE apparently now agrees that Gurganious lawfully obtained the emails from James and properly used them in the Duggins/Hudson campaign. That is the correct outcome.

AFGE authorized James, as part of her official duties, to access and disseminate the AFGE Membership Database to AFGE members and elected officials for official AFGE business use. Former AFGE Field Services official Derrick Davis who worked alongside Cara James attests that he and James routinely distributed Membership Data upon request to AFGE members

and AFGE officials as part of their duties. (*Exh. 5: Decl. of Derrick Davis, dated May 5, 2022 (Davis Decl.)*

When James sent the email to Gurganious, she and Derrick Davis were working in AFGE's Department of Field Services under the supervision of Director David Cann. According to Cann, all of the staffers under his supervision had access to "e-mail lists that with a few keystrokes you can then send an e-mail out to the entire…staff…organizers…legislative political organizers,…[and] local presidents." Cann Dep. 33:10-16. "[T]here is a database of members and locals that staff does have access to." Cann Dep. 33:20-21. This establishes that part of James' duties was to provide email addresses to AFGE members and officials, including Defendant Gurganious, upon request.

AFGE claims that in June 2015 James acted outside the scope of her employment by sending the emails first to her personal Gmail account and then forwarding them to Gurganious, suggesting some sinister motive on James' part.  A jury may reasonably disagree because from June 2015 when James downloaded the emails until December 2016 when AFGE adopted the new PII and Computer Usage policies, AFGE permitted **all** AFGE staff and officers to transmit sensitive PII information outside AFGE using either their personal email accounts or their unencrypted AFGE email accounts*.  (Hudson Decl. 2, at 4)* AFGE allowed this practice because many AFGE staff members and officers preferred *not* to use the AFGE email system, believing that using their work email accounts permitted AFGE to monitor their personal emails and invade their privacy.  *Id.* District 12 NVP George McCubbin voted against changing the practice for that very reason.  *Id.* Given this policy that was in place in June 2015, AFGE has produced no evidence that James tried to "hide" the fact that she was providing the list to Gurganious outside of AFGE's official channels and procedures.  Furthermore, AFGE's exhibits establish that

James, like the approximately 1,000 AFGE elected officials and staff with access to the

Membership Database, regularly downloaded portions of the Membership Database into their

unencrypted AFGE email accounts or their personal email accounts and then forwarded them to

others as they saw fit.  For example, Anthony Livingston sent emails to Felicia Sharp from his

unencrypted AFGE work email account.  Sharp then forwarded the emails she received from

Livingston to Hudson *with a copy to AFGE Council President Al Burgess* from her AFGE Local

email account.  The practice of AFGE officials using their personal and/or unencrypted AFGE

email accounts to transact business was so common that AFGE IT Director Taylor Higley

recommended the adoption of a new policy to stop it in mid-May 2015, just a couple of weeks

before James forwarded the emails to Gurganious. *(See: Exh. 6:  May 12, 2015 NEC Minutes).*

However, AFGE delayed adopting the new policy until December 2016 – 18th months *after*

James had already forwarded the database to Gurganious. *Id.* The December 2016 IT Policy

Manual states on page 4, "Information Flow Enforcement – External PII Information Flow":

> *"When sensitive PII information must be transmitted outside AFGE, strong encryption methods* **must** *be utilized.  Wherever possible,* **AFGE will deploy capabilities to detect unencrypted PII data flow in and out of the enterprise and either reject the data flow or apply suitable encryption to it**." *(See: Exh. 7: IT Policy Excerpt, dated December 21, 2016) [Emphasis Added]*

Great policy, but AFGE adopted it too late.   Had this policy been in effect 18 months earlier,

Director of Information Services Taylor Higley or his cyber security team would have detected

the unencrypted spreadsheet containing 6,000 AFGE members' personal information that Cara

James downloaded to her private email address and "applied suitable encryption to it."

Unfortunately, AFGE dropped the ball on this one and now seeks to blame it on Defendant.

Moreover, AFGE did *not* act as if there was a problem with James sending the 6000 emails to

her personal Gmail account.  Two years later, in 2017, AFGE General Counsel David Borer

casually admitted that AFGE staff often sent emails from the Membership Database to AFGE candidates but claimed the union "immediately retrieved" them. *(Exh.8: January 23, 2017 Borer Email).* Clearly, AFGE failed to "retrieve" the 6000 emails that James downloaded from the AFGE server to her personal Gmail account and then forwarded to Gurganious.  A jury may reasonably conclude that even before the new policy was adopted, alarm bells should have gone off within AFGE's IT department when James (or any other AFGE employee with authorization to access the Membership Database) downloaded 6000 purportedly "trade secret" email addresses from the AFGE server to their personal email account.  AFGE's failure to detect the security breach is evidence of gross negligence.  This is particularly true in James's case because AFGE acknowledges that James had been under a Performance Improvement Plan ("PIP") since March 2015 when she downloaded the emails to her personal account.  Office and Professional Employees International Union (OPEIU) Local 2 represents all non-elected, AFGE headquarters staff, including Cara James.  After James's supervisor, FSED Director David Cann, placed James on the PIP in March 2015, James immediately asked OPEIU Local 2 Steward Jocelynn Johnson and asked for union representation Declaration of Jocelynn Johnson, dated June 30, 2022 *(Exh. 9: Declaration of Jocelynn Johnson, dated June 30, 2022 (Johnson Decl.)*  Johnson attests that based on her experience, when an AFGE employee is placed on a PIP their supervisors closely monitor all of their work daily, particularly their computer work.  *Id*. According to Johnson, beginning in March 2015 when Cann placed James on the PIP, Cann and AFGE would have promptly severely curtailed or eliminated James' access to sensitive data such as the Membership Database.  *Id*. Inexplicably, Cann claims he was *not* aware that James sent the 6000 purportedly trade secret emails to herself from AFGE's computers while he was closely supervising her work under the PIP  [Cann Dep. 61:2-62:10]—despite the fact that the James

Spreadsheet contains the "sensitive personal information" of 6,000 AFGE members. AFGE SUMF ¶ 27.   AFGE's admission that while on a PIP, James was able to download 6000 emails from AFGE's sophisticated network server and transfer them to her personal account without her supervisor's knowledge establishes that AFGE negligently supervised James. Having failed to properly supervise James, AFGE cannot now complain that James' disclosure of the AFGE Member Database information "does not constitute a voluntary disclosure by AFGE."

In the District of Columbia, employers are generally "bound to use reasonable care to select employees competent and fit for the work assigned to them and to refrain from retaining the services of an unfit employee." Schecter v. Merchants Home Delivery, Inc., 892 A.2d 415, 431 (D.C. 2006) (quoting Fleming v. Bronfin, 80 A.2d 915, 917 (D.C. 1951)) (internal quotation marks and citation omitted). When an employer has disregarded this duty and "as a result injury is occasioned to a third person," liability may be imputed to the employer "even though the injury was brought about by the willful act of the employee beyond the scope of his employment." Id. (quoting Fleming, 80 A.2d at 917) (internal quotation marks and citation omitted).  *Search v. Uber Techs., Inc.*, 128 F. Supp. 3d 222, 229 (D.D.C. 2015).  AFGE's disregard of its duty to supervise James resulted in injury to Defendant Hudson who has suffered mightily as a result of AFGE's filing this defamatory amended complaint in September 2018 falsely claiming that Hudson "stole" and misappropriated AFGE's trade secrets and violated federal computer fraud and abuse law.  Worse, AFGE amended the complaint *after* Gurganious explained to AFGE in August 2018 that James had provided him with the emails in 2015 for campaign purposes and that Gurganious, in turn, had provided them to Hudson and Duggins three years later for use in their campaign.

AFGE claims that the James Spreadsheet violates the December 2016 PII Policy because the spreadsheet contains PII (the last four digits of the members' Social Security numbers). Amended Comp'l ¶ 52. Hudson disagrees. The last four digits, standing alone, do not constitute PII. If that were so, AFGE is currently in violation of the PII Policy by including the last four digits in its Membership Database to which more than 1000 AFGE elected officials and staff members currently have access. And for years, AFGE has provided all candidates with one free set of mailing labels containing the members' PII – their home addresses and telephone numbers. Regarding AFGE's claims that James violated the PII Policy by providing Gurganious with emails that contained the last four digits of the members' SSNs, the December 2016 PII Policy was not in existence when James sent the James Spreadsheet to Gurganious in 2015—so she could not have violated any such policy. AFGE admits that when James provided Gurganious with the emails in 2015, the union had not yet "scrubbed" its Membership Database of the personal identifying information (last four digits of the SSN) of its members. Thus, emails containing the last four SSN digits were the only emails available to James when she provided them to Gurganious and other AFGE officials as part of her duties.

In or around September 2017, Duggins and Hudson agreed to run as slate mates for the 2018 AFGE Convention. Hudson ran for AFGE National President and Duggins for AFGE National-Secretary. Gurganious emailed the James Spreadsheet to Duggins to be used for Duggins's and Hudson's joint campaign effort. Duggins then emailed the James Spreadsheet to Hudson. AFGE SUMF ¶¶ 28, 33, 45. Hudson did not become aware until February 2018 that the James Spreadsheet originally came from Cara James, when Gurganious told him the same. Gurganious Dep. 105:2-9. When Gurganious told Hudson that James had provided the spreadsheet to him, Hudson did not remark that the information in the spreadsheet probably

came from AFGE's member database. Gurganious Dep. 110: 5-11. Thus, it was not until 2018 when Hudson became aware that James had given the James Spreadsheet to Gurganious in 2015, who then gave it to Duggins, who, in turn, gave it to Hudson. Hudson Dep. 144:16-18; 145:2-5.

Additionally, it was not until AFGE filed the instant lawsuit in May 2018 that Gurganious and Hudson became aware that AFGE was claiming the James Spreadsheet was AFGE property. Gurganious Dep. 108: 14-15. Before May 2018, Gurganious, Hudson, and Duggins had perceived the information in the James Spreadsheet as "just email addresses, and so it wasn't really a big deal to us." Gurganious Dep. 108: 16-1. According to Gurganious, "That's why I didn't password protect it or do anything like that. So it wasn't a big deal to us, because we perceived it as nothing but a list for email addresses." Gurganious Dep. 108: 16-20. Because both Gurganious and Duggins had used the email address information in the James Spreadsheet for Duggins's election campaign in 2015, when Hudson used the same email address information in his joint campaign with Duggins in 2017 and 2018, he did not think there was anything wrong with doing so. Hudson stated, "[T]o my knowledge, there's no prohibition against you using E-mails or a list that you were given on a previous election. I don't know of any policy that says that it is." Hudson Dep. 145: 5-10. When asked whether he returned the member data in the James Spreadsheet to AFGE when AFGE terminated his employment in February 2018, Hudson responded that because he received the information from Duggins, not from AFGE, he did not return the information to AFGE. Hudson Dep. 142: 12-15; 145: 18-20. Hudson denied that the information is AFGE's property, since "Dana [Duggins] received that information in 2015, the same as all other candidates." Hudson Dep. 142: 9-24.

*The Sharp Spreadsheet*

In or around February 2017, Anthony Livingston, an AFGE staff member in the

Legislative and Political Department, sent to Felicia Sharp a spreadsheet containing data

concerning approximately 256 AFGE Members, including their email addresses ("Sharp

Spreadsheet"). At that time, Sharp was "the AFGE Local 1014 President and the Council 1 2nd

Vice President." AFGE SUMF ¶ 40; Higley Dec'l. ¶ 53, Exh. 13 to AFGE's SUMF ¶ 40.

According to AFGE, "Since February 2015, Livingston has had AFGE credentials with access

permission for the AFGE Member Database because his job duties require him to access

information on the AFGE Member Database for official AFGE business." AFGE SUMF ¶ 40.

On August 11, 2017, Sharp sent the Sharp Spreadsheet to Hudson without disclaimers or

restriction on its use. AFGE SUMF ¶ 39. After Hudson received the Sharp Spreadsheet, he

forwarded it to Devlin Hillman. Hillman created an account with iContact, a third-party vendor,

who imported the information in the Sharp Spreadsheet into its database and managed the email

list for Hudson and Hillman. Hillman Dep. 50: 5-6, 13-21; 51: 20-25. Hudson and Duggins used

the 256 email addresses received from Sharp in their joint campaign, bringing the total amount of

AFGE emails used by Hudson and Duggins in 2017 and 2018 to approximately 6,600 of AFGE's

310,000 union members (or about 2% of the AFGE members' emails).

*AFGE's Policies*

AFGE claims it maintains two similar PII Policies – one for Employees and one for

Officers and Membership (collectively, "PII Policies").  AFGE SUMF ¶ 9. Both policies, AFGE

insists, prohibit the disclosure of PII to individuals without a "need to know." Mot. S.J. at 8.

AFGE has not established whether James was aware of the PII Policies or received training on

the policies.  Likely not. According to AFGE's exhibits, the new PII policy was adopted on

December 21, 2016 – 18 months *after* James gave Gurganious the James Spreadsheet. AFGE also claims that it safeguards its databases by, among other things, limiting access to the databases to role-based access, based on the principle of least access. Amended Comp'l. ¶ 13. This is a disputed material fact. AFGE's exhibits establish that AFGE authorized  Cara James, Anthony Livingston, Felicia Sharp, and approximately 1000 other AFGE National, Council, and Local elected AFGE officials and AFGE staff (including Derrick Davis) to access,  download, and disseminate emails in the Membership Database.

    AFGE also claims it maintains an Electronic Mail, Internet & Computer Usage Policy ("Computer Usage Policy"), "which restricts use of AFGE computer systems to legitimate AFGE business purposes." Amended Comp'l ¶ 15.  But AFGE concedes that the Computer Usage Policy permits "limited personal use of the computer systems [and the use of personal email accounts]" that must "comply with AFGE policies." *Id.* Again, AFGE did not disclose the date the union implemented the Computer Usage Policy or the date, if any, that AFGE provided Defendants, Cara James and the other 1000 AFGE officials authorized to access the Membership Database with a copy of the policy.  AFGE's exhibits indicate the PII policy was adopted on December 21, 2016, which is 18 months *after* Cara James provided the emails to Gurganious. James could not possibly have violated a policy in June 2015 that did not yet exist.

    AFGE admits that it was not until February 15, 2018, that it engaged TrueBallot, "a third-party vendor, to administer the process through which candidates could send emails promoting their campaigns to AFGE Members." AFGE SUMF ¶ 11. Thus, when Gurganious and Duggins used the email addresses provided to them in the James Spreadsheet for their campaigns in 2015, and when Hudson and Duggins used the email addresses provided to them in the James and Sharp spreadsheets in their 2017-2018 campaigns, they were not in violation of the

TrueBallot process for obtaining emails. The AFGE Constitution is silent on the use of emails. Thus, Defendants were lawfully using the process identified in *Dimondstein* to obtain AFGE member email addresses and to use those email addresses to send out their campaign literature. Until February 15, 2018, there was no other process made available to Hudson and Duggins to obtain AFGE member email addresses for use in their campaigns.

*From 2015 through 2019, AFGE did not make its membership aware of its written policies.*

Like all NEC members, then-NST Hudson relied on AFGE's General Counsel for legal advice regarding the application of AFGE written policies and on the Human Resources Department for training on those policies.  AFGE did not provide Hudson with a copy of the PII policy or provide him (and the other NEC members) with training on the application of the PII policy.  Moreover, Hudson was not aware of the implementation of the December 2016 PII policy because AFGE had a practice of not posting its policies on the AFGE website.  In fact, on November 6, 2015, about one year before AFGE adopted the December 2016 PII Policy, then-NST Hudson repeated for the second time, in writing, his request that AFGE General Counsel David Borer provide him with a binder containing all written AFGE policies. *(Ex. 10 Email from Arla Bentley to David Borer dated November 6, 2015).* Borer refused to do so, explaining that the policies had not yet been compiled and assembled.  AFGE delegates, frustrated with AFGE's refusal to inform the membership about new NEC written policies, passed a resolution during the 2018 AFGE convention directing AFGE to post all written AFGE policies on the AFGE website. Despite this resolution, one year later, National Vice President David Mollett testified that AFGE never provided him with a binder containing all of AFGE written policies during his orientation as a new national officer. (*See: Exh 11: Mollett Depo Excerpt,  p.73).* President Everett Kelley

testified similarly during his deposition in that case. (*See: Exh 12: Kelley Depo Excerpt, p .236-238*)

The AFGE National Constitution and AFGE's written policies do not prohibit a candidate from sharing with other AFGE candidates the email addresses and mailing labels obtained from AFGE to distribute campaign materials. As Hudson testified at his deposition, he was not aware of any AFGE policy prohibiting him from using in his 2017-2018 campaign for AFGE President the e-mail information or mailing labels left over from previous elections. Hudson Dep. 145: 5-10. Because AFGE did not have any written policies which were accessible to its membership, Hudson was not aware that his using the email information contained in the James and Sharp Spreadsheets violated any AFGE policies—especially since Gurganious and Duggins had used the same email information in Duggins's 2015 campaign for AFGE National President without objection from AFGE.

## LEGAL ARGUMENT

### I.      This Court lacks jurisdiction to hear Plaintiff's LMRDA claims.

AFGE is judicially estopped from asserting that this Court has jurisdiction to hear its LMRDA claims against Mr. Hudson, because in related Civil Action 19-2738, *Hudson v. AFGE (JEB),* AFGE successfully argued the opposite.  AFGE argued that because Mr. Hudson is a former federal government employee,  the Civil Service Reform Act of 1977 preempts the district court's jurisdiction to hear his LMRDA claims. Mr. Hudson certainly disagrees with AFGE's position that the CSRA preempts the district court's jurisdiction. But in all fairness, AFGE cannot have it both ways.  If the district court lacks jurisdiction to hear Mr. Hudson's LMRDA claims against the union because, as AFGE insists, they are preempted by the CSRA because Mr. Hudson is a public sector employee,  AFGE cannot argue that this Court has

jurisdiction to hear AFGE's LMRDA claims against Mr. Hudson. Thus, AFGE is judicially

estopped from making an opposing argument to the one it successfully made in case 19- 2738.

*Temple Univ. Hosp., Inc. v. NLRB*, 442 U.S. App. D.C. 213, 217, 929 F.3d 729, 733

## II.    This Court Should Dismiss or Deny Summary Judgment on AFGE's Claim that Hudson Misappropriated AFGE's Trade Secrets.

AFGE contends that Hudson's "acquisition and use of AFGE's Membership Database

constitutes a misappropriation of AFGE's trade secrets." Mot. S.J. at 26. Under the D.C.

Uniform Trade Secrets Act "(DCUTSA"), "[t]o establish a trade secret misappropriation claim,

[a plaintiff] must demonstrate (1) the existence of a trade secret; and (2) acquisition of the trade

secret by improper means, or improper use or disclosure by one under a duty not to disclose."

*DSMC, Inc. v. Convera Corp.,* 479 F. Supp. 2d 68, 77 (D.D.C. 2007).  Because there exist

genuine issues of material fact regarding each of these elements of AFGE's DCUTSA claim,

summary judgment must be denied.

### A.    Genuine issues of material fact exist as to whether AFGE's Member Data constitutes a trade secret.

Under the DCUTSA, in order for information to constitute a "trade secret," the

information (1) must be secret; "(2) 'its value must derive from its secrecy'; and (3) its owner

must use reasonable efforts to safeguard its secrecy." *DSMC, Inc. v. Convera Corp.,* 479 F.

Supp. 2d 68, 77-78 (D.D.C. 2007) (citation omitted).

1.    AFGE's Member Database is not secret.

AFGE contends that because Hudson "spent months attempting to get the information—

specifically the email information—this shows conclusively that the information was 'not

generally known.'" Mot. S.J. at 26 (citing D.C. Code § 36-401(4)). The reason that Hudson

"spent months attempting to get the [email] information" was because AFGE refused to provide

that information to him—in violation of his rights under *Dimondstein.* Moreover, as AFGE admits, the AFGE Membership Database is "readily accessible to many AFGE staff members," including, approximately 1,000 AFGE National, Council, and Local elected officials and AFGE staff members to whom AFGE has issued AFGE-issued credentials authorizing them to access the database.  (Decl. of Hudson). At the same time, AFGE admits that "certain individual elements in AFGE's Member Database may be discoverable through public means [including presumably email addresses that can be accessed through the Internet].  But AFGE insists that "[e]ven if individual elements are known to the public, a trade secret can exist in a unique combination of those otherwise publicly available elements." Mot. S.J. at 26.  Importantly, AFGE concedes that "[f]ederal regulations *require* AFGE to ensure equal access for *all candidates to the Membership Database*, a union resource." Because the Membership Database is accessible to all candidates and all National, Council, and Local elected officials, the information in its Member Database cannot be said to not be "generally known."  "Whether a particular piece of information is a trade secret is generally a question of fact . . . after full presentation of the evidence from each side" and not for the Court to determine at the summary judgment phase. *DSMC, Inc. v. Convera Corp.*, 479 F. Supp. 2d 68, 77-79 (D.D.C. 2007) (internal quotation marks and citation omitted).

To establish that the data base is a trade secret, AFGE must further allege that it was "drawn from data in a password protected confidential database; and (4) was marked "confidential and proprietary." *Id.* AFGE *admits* that it gave James the password to access the database and that James downloaded the database to her personal Gmail account and forwarded the database to Gurganious's personal email account.  And AFGE does not deny that when Gurganious received the emails from James, the Membership Database was not marked

"confidential and proprietary" or password protected. Likewise, the Sharp Spreadsheet was *not* marked confidential and proprietary or password protected when AFGE authorized Livingston to share it with Sharp, and when Sharp, in turn, sent it to Hudson.  As evidence that the email information in the Sharp Spreadsheet is not a trade secret, after learning that Livingston shared the email information with Sharp and that Sharp shared them with Hudson without marking them "confidential and proprietary," AFGE did not take any disciplinary action against Livingston or Sharp.

> The DCUTSA defines a "trade secret" as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (A) [d]erives actual or potential independent economic value, from not being generally known to, and **not being readily ascertainable by proper means by another who can obtain economic value from its disclosure or use**; and (B) [**i**]**s the subject of reasonable efforts to maintain its secrecy."** D.C. Code § 36-401(4). Information, which is generally known within industry, even if it is not generally known to public, cannot constitute "trade secret" under District of Columbia law.

*Catalyst & Chemical & Chemistry Services, Inc. v. Global Ground Support*, 350 F. Supp. 2d 1, 8 (D.D.C. 2004).  AFGE cannot establish that its Membership Database is a trade secret not otherwise readily ascertainable to Defendants because AFGE is legally required under federal law to provide essentially the same Membership Database *in the form of mailing labels* to Defendants Gurganious, Duggins, and Hudson and **all** AFGE candidates ahead of an election. Nothing in the AFGE Constitution or the DOL regulations prohibits a candidate from reusing unused mailing labels in a subsequent election or from sharing labels with another candidate.

For years, pursuant to federal labor law and the AFGE Constitution and upon written request from a candidate, AFGE has been required to provide all candidates, including Defendants, with one free set of mailing labels (containing the names, and home and/or work addresses) for all 310,000 AFGE members (or any portion thereof identified by the candidate).

Along with the first set of free mailing labels, AFGE provides each candidate with a separate list containing the phone numbers of all AFGE members for whom the candidates request mailing labels.  In addition, any candidate has the right to purchase additional sets of the mailing labels at their own cost.  The only difference between the PII contained in the electronic Membership Database and the mailing labels is that the mailing labels contain the telephone number and home and/or government address of each member and the emails contain each members' birth date and the last four digits of their Social Security Numbers (SSN). Because birth dates do not appear in the mailing labels, AFGE suggests that Defendants violated their trade secrets in the electronic Membership Database by using the birth dates contained there to send birthday greetings to the members.  This argument fails because if one has the name, address, and telephone number of an individual, their birth date is "readily ascertainable" on the Internet. Defendants have no need for the last four of the SSN to distribute their campaign literature.  In any event, the four digits, standing alone, do not constitute personal identifying information.

> 2.    The Member Database does not derive value from its secrecy because it is not "secret."

AFGE contends that the "Member Database derives value from the fact that it is not generally known." Mot. S.J. at 27. AFGE states that Gurganious and Hillman confirmed "that the Member Data that the campaign had was valuable because it was not widely known." Mot. S.J. at 27 (citing Gurganious Dep. at 163). When asked in his deposition if Duggins shared the James Spreadsheet with anyone else, Gurganious testified in his deposition as follows:

> A:    I didn't share it with Dev [Hillman].
> Q:    Right.
> A.    And to kind of explain why I didn't share the email list was because it was kind of my notch in my belt that I did, that was the work I did, and so, therefore, I didn't want to share that with anybody else because I had a fear that I wouldn't be useful.
> Q:    It was what you brought to the table.

> A.    That's what I brought to the table.
> Q.    Right. So then that was valuable.
> A.    Yeah.
> Q.    Okay.
> A.    So that was something that was in my wheelhouse and I was going
>        to control.

Gurganious Dep. at 163: 3-25. At the time Gurganious gave the James Spreadsheet to Duggins in

2015, he was working on her campaign for AFGE National President. That was the "work [he]

did." Gurganious did not testify that the information in the James Spreadsheet was valuable

because it was not "widely known." After all, apparently like any other candidate in 2015 and

about 1000 AFGE elected officials and members, Gurganious had easily obtained it from

AFGE. It was valuable to Gurganious because the information in the James Spreadsheet helped

him in his work on Duggins' campaign. Just because Gurganious was in receipt of the James

Spreadsheet containing AFGE member information, does not mean that the AFGE member

information was not widely known to others. In fact, AFGE states that:

> AFGE uses the Member Database to (1) grow its membership; (2) encourage its
> members to write to legislators concerning critical legislation affecting AFGE's
> interests and the interests of its members; (3) promote membership participation in
> AFGE events, rallies, and conferences; and (4) inform AFGE Members about
> AFGE's PAC, which accepts donations from AFGE members.

Mot. S.J. at 28. AFGE is also required under federal law and *Dimondstein* to share that same

Membership Database with Hudson, Duggins, Gurganious and other candidates. Thus,

Defendants' use of the James and Sharp Spreadsheets aligns with AFGE's purposes in using the

Member Database. AFGE did not offer TrueBallot to Defendants until February 2018. Until that

time, Defendants had no other way to send their 2018 campaign emails other than to use the

email addresses Gurganious had obtained from James and the Sharp Spreadsheets. AFGE further

contends that because Hudson, Duggins, and Gurganious did not send their campaign emails

through TrueBallot, which was AFGE's "authorized vendor for sending campaign emails to

AFGE Members," Mot. S.J. at 28-29, Defendants saved substantial amounts of money. Whether Defendants saved money from not using TrueBallot does not impact whether the Member Database derives value from its secrecy. This is just another red herring that AFGE is throwing at the Court.

The 5,500 emails provided by James to Gurganious when combined with the emails that Felicia Sharp obtained from AFGE employee Anthony Livingston and provided to Hudson constitute *2%* of the total 310,000 Membership Database. AFGE has not established "how it derives economic value" from the secrecy of **2%** of the AFGE Membership Database.  Further, AFGE failed to establish that the Membership Database is not readily ascertainable 'by another who can obtain economic value from its disclosure or use.'" *Id.* (quoting D.C. Code § 36-401(4)) since U.S. DOL regulations, the AFGE Constitution, AFGE's policies, and the *Dimondstein* case <u>required</u> AFGE to share the *entire* 310,000 AFGE Membership Database with Defendants Gurganious, Duggins, Hudson, or any other AFGE candidate for office who requested it, albeit through a third party provider at their own cost.  Indeed, AFGE admits that if Hudson had requested the entire AFGE Membership Database (which AFGE states represents 290,000 of the 310,000 AFGE members) in November 2017, AFGE would have provided them to him at a cost of $2197. (Exh. 13: AFGE Motion for SJ Excerpt)

       3.    AFGE failed to use reasonable efforts to secure the Member Database.

AFGE did not use reasonable efforts to safeguard the secrecy of the Member Database. AFGE has a sophisticated in-house IT department.  In his 2018 affidavit, Taylor Higley testified that one of his responsibilities as IT Director is to "monitor and investigate any incidents related to AFGE's computer systems," which includes protecting AFGE's email lists from unauthorized use by AFGE staff. [Higley Decl., at p. 1, ¶2]. Cann was closely

monitoring James' work since placing her on the March 2015 PIP. *(Exh. 9: Johnson Decl.)*
Yet, after James transferred the AFGE email database of 5,500 AFGE members to from the
AFGE server to her personal email account in 2015, neither David Cann, Taylor Higley, nor
any other AFGE official objected or took remedial action to retrieve the purportedly secret
and confidential trade secret emails.  Moreover, after receiving them from James, Gurganious
used those same 5,500 purportedly secret and confidential trade secret emails to send out
campaign material in his and Defendant Duggins' 2015 AFGE campaign.  AFGE, J. David
Cox, David Cann, and Taylor Higley did not object and took no remedial action against
Gurganious or Duggins.  Instead, AFGE waited three years before filing this litigation against
Hudson claiming that in November 2017 after the federal court reinstated him as NST,  *he*
"stole" or directed others to steal the emails and thereby misappropriated AFGE's trade
secrets and violated his fiduciary duties.   Defendant disputes these claims.  The Court should
dismiss them, or, in the alternative deny Plaintiff's motion for summary judgment and allow
the jury to decide them.

> **B.  Genuine issues of material fact exist as to AFGE's claim that Hudson
> "misappropriated" the Member Data.**

AFGE contends that "[t]here is no genuine dispute that Hudson knew or had reason to
know that he acquired the Sharp Spreadsheet by 'improper means.'" SJ at 33. Hudson disputes
this.  AFGE relies on Sharp's email to Hudson, which purportedly shows "that the spreadsheet
was meant for use in AFGE business concerning DOD medical professionals and not for a
political campaign." SJ at 33. AFGE admits that Livingston "had AFGE credentials with access
permission for the AFGE Member Database," and that Livingston sent the Sharp Spreadsheet to
Sharp in February 2017. AFGE SUMF ¶ 40. AFGE states that Sharp's "duties and
responsibilities in those roles included receiving and using information in the AFGE Member

Database for official AFGE business purposes." AFGE SUMF § 40. When Sharp sent the Spreadsheet to Hudson, AFGE did not have in place any other way for candidates to get the email information of its members other than through the Member Database. *(Exh. 2:Hudson Decl.)*. AFGE did not offer TrueBallot as an option to Defendants until February 2018. *Id.* Consequently, when Sharp sent the Sharp Spreadsheet to Hudson in August 2017, neither Sharp nor Hudson violated any laws or any of AFGE's policies. While AFGE contends that "Hudson knew or should have known that Sharp's disclosure violated the No Politics Rule and the Computer Usage and PII Policies that were adopted during his tenure," SJ at 33, Hudson's evidence contradicts that he "knew or should have known" about these policies. AFGE had refused to post its policies where members could access them. Even after its members passed a resolution in 2018 requiring AFGE to make its policies accessible to its members, AFGE still failed to do so. *Id.* AFGE contends that Hudson "knew or had reason to know the [James Spreadsheet] was derived from or through a person who utilized improper means to acquire it." SJ at 33. Evidence in the record disputes this fact. Gurganious testified in his deposition that it was not until February 2018 that Gurganious revealed to Hudson that James was the source of the James Spreadsheet. Gurganoius Dep. at 105:2-7; 106: 13-15. Gurganious also testified that they (Gurganious, Duggins, and Hudson) did not consider "the loss of personal identifiable information as being a problem. We perceived it as just email addresses, and so it wasn't really a big deal to us. That's why I didn't password protect it or do anything like that." Gurganious Dep. at 108: 15-18. As Gurganious stated, it was not until AFGE filed the instant lawsuit in May 2018 that they "considered the loss of personal identifiable information as being a problem." Gurganious Dep. at 108: 14-15.

AFGE admits that "the Member Database…like all AFGE resources, must not be used to promote internal political campaigns, *outside of certain limited and well-defined circumstances authorized by AFGE.* Mot. S.J. at 7.  Those limited and well-defined circumstances were present in June 2015 when, in compliance with the *Dimondstein* dictates and months before AFGE adopted the December 20, 2016 email distribution policy, AFGE employee James provided Gurganious, an AFGE member and elected AFGE Local 3509 official, and candidate for the position of Chair of AFGE's YOUNG Committee, with approximately 5,500 AFGE union members' email addresses (Membership Database) in June 2015.  That year, Defendant Dana Duggins was running for AFGE National President against then-incumbent J. David Cox, and Gurganious supported Duggins.  When James accessed, downloaded, and provided to Gurganious what AFGE now describes as 6000 emails from the purported "trade secret" protected Membership Database in June 2015, James did so as part of her official duties which included accessing, downloading, and distributing AFGE members' email address to AFGE elected officials, as needed. James routinely carried out these and other functions as part of her assigned duties with authorization from AFGE.

Even if, as AFGE claims, James gave the Membership Database to Gurganious to use in his and Duggins' 2015 AFGE election campaigns, that would not have been unusual.  AFGE Field Services official Derrick Davis attests that he and James routinely provided AFGE members, AFGE elected Local, Council and National Officers, and others with Membership Database emails. *Id.*  Mr. Davis attests that AFGE never provided him with any written policies prohibiting the distribution of the AFGE Membership Database to AFGE members and staff. *Id.* AFGE seeks to sidestep responsibility for James' actions by arguing that AFGE did not authorize the disclosure of the emails to Gurganious:

On June 6, 2015, Cara James, a now-deceased former employee of AFGE, sent the Gurganious Email from her official AFGE address to her personal Gmail address attaching a spreadsheet containing confidential trade secret information derived from the AFGE Member Database.  Upon information and belief, this was done to hide the fact that she was providing the list to Gurganious outside of AFGE's official channels and procedures. She immediately forwarded that email from her personal Gmail address to Gurganious at his personal Gmail address. James's emails attaching the AFGE Member Database information (both to her personal Gmail address and to Gurganious) were unauthorized and strictly prohibited by the PIIPolicies and the Computer Use Policy. James's unauthorized disclosure of the AFGE Member Database information does not constitute a voluntary disclosure by AFGE. Any further disclosure by Gurganious of the Member Database information wasalso unauthorized and strictly prohibited by the AFGE PII Policies.

Amended Comp'l ¶¶ 51-54.

The Court should reject this argument.  In the District of Columbia, employers are generally "bound to use reasonable care to select employees competent and fit for the work assigned to them and to refrain from retaining the services of an unfit employee." Schecter v. Merchants Home Delivery, Inc., 892 A.2d 415, 431 (D.C. 2006) (quoting Fleming v. Bronfin, 80 A.2d 915, 917 (D.C. 1951)) (internal quotation marks and citation omitted). When an employer has disregarded this duty and "as a result injury is occasioned to a third person," liability may be imputed to the employer "even though the injury was brought about by the willful act of the employee beyond the scope of his employment." Id. (quoting Fleming, 80 A.2d at 917) (internal quotation marks and citation omitted).  Search v. Uber Techs., Inc., 128 F. Supp. 3d 222, 229 (D.D.C. 2015).  AFGE seeks to further disparage its former employee, Cara James,  who is deceased and cannot defend herself, arguing:

There is no doubt that James removed the James Spreadsheet from AFGE's system through improper means. HIRECounsel D.C., LLC v. Connolly, No. CV 20-3337 (EGS), 2021 WL 5998365, at *6 (D.D.C. Dec. 20, 2021) (holding that employee used improper means to acquire employer's [sic]"when he emailed the information to his personal email address 10 days before he resigned from his position"). When she disclosed the James Spreadsheet to Gurganious, James was a disgruntled employee at the end of a failed PIP and likely to be leaving AFGE soon, whether voluntarily or not. SUMF ¶29; SUMF ¶27. She used "stealth" to acquire the James Spreadsheet because she did not discuss sending

> the spreadsheet with her supervisor, though they were regularly discussing every bit of
> work she was doing at the time, and she sent the spreadsheet to her personal Gmail
> address first before sending it to Gurganious for use in a political campaign, in violation
> of the AFGE Constitution, the No Politics Rule, the Computer Usage Policy, and the PII
> Policies. SUMF ¶24.

Mot. S.J. at 33-34. That AFGE believes that James was disgruntled is of no significance for

purposes of establishing AFGE's responsibility for James' actions under the theory of

*respondeat superior.* Assuming, for the sake of argument, that James acted beyond the scope of

her employment in providing Gurganious with the emails (which she did not) AFGE remains

liable. AFGE falsely defamed Defendant Hudson and Defendant Duggins' reputations by falsely

accusing them of theft, conversion, violating their fiduciary duties, and misappropriating trade

secrets, causing them severe emotional distress, and forcing them to incur legal fees to defend

AFGE's wrongful lawsuit filed in this case.

AFGE improperly cites *HIRECounsel* in its motion for summary judgment. That case

involved a lawsuit by an employer whose employee executed a binding nondisclosure agreement

not to disclose confidential trade secrets, but who took a screen shot of trade secret information

before resigning. Here, James did not execute a nondisclosure agreement that restricted her from

downloading and distributing the AFGE Membership Database to AFGE members and elected

officials on an as-needed basis. Indeed, AFGE hired James to perform those duties as part of her

employment with AFGE.

Even if the Court rules that the electronic Membership Database is a trade secret, which

should not, AFGE has not alleged or established that James misappropriated the trade secret by

acquiring access to the database "by improper means." Nor has AFGE established that James

was under a "duty **not** to disclose" the database to Gurganious. Former AFGE Field Services

official Derrick Davis, who worked alongside Cara James, attests that he and James routinely

distributed the emails of AFGE members and delegates upon request to AFGE members and

AFGE elected officials as part of their duties. *(Derrick Davis Decl., Ex. 5)*.  This establishes that

part of James' duties as an employee in the Field Services Department was to provide email

addresses to AFGE members and elected officials, including Defendant Gurganious, upon

request.

 AFGE asserts that the union learned that James sent the email containing the

approximately 5,500 AFGE members' email addresses to Gurganious (the "Gurganious Email")

for the first time on or about August 14, 2018.  AFGE alleges it learned this after Gurganious,

through counsel, disclosed that fact during settlement discussions in this case.  As an employer

claiming that its employee, Cara James, had unlawfully provided a valuable "trade secret"

Membership Database to Gurganious for campaign purposes without authorization and beyond

the scope of her employment in violation of what AFGE describes as its "bedrock No Politics

Rule," AFGE's response to the purported crisis was uncharacteristically muted.  Moreover,

AFGE has previously erroneously provided emails to candidates from the Membership Database

-- and immediately retrieved them. However, AFGE did not immediately retrieve the emails

which Cara James sent. *(Ex. 8, January 23, 2017, Borer Email)*.

 After all, AFGE contends in its September 2018 Amended Complaint that after unlawfully

converting and misappropriating the trade secret emails in 2015, "Gurganious provided the

Gurganious Email to Duggins in connection with her campaign for AFGE office" and

"Gurganious and/or Duggins then provided the same information to Hudson in connection with

his [2018] campaign for AFGE office." Amended Comp'l ¶ 55. AFGE accuses Gurganious of

violating the federal criminal and civil computer fraud statutes, converting AFGE property, and

misappropriating AFGE's trade secrets, all while violating his fiduciary duties as an AFGE

elected official in 2015.  Yet, after discovering in 2018 that Gurganious had originally obtained the emails from James in August 2015, AFGE did not amend its complaint to add the 2015 allegations against Gurganious.

AFGE charges that  "any further disclosure by Gurganious of the Member Database information" that he obtained from James and sent to Duggins and Hudson in 2018 "was also unauthorized and strictly prohibited by the AFGE PII Policies." Amended Comp'l ¶ 55. Yet, despite the seriousness of these allegations, as previously stated, AFGE settled with Gurganious, dismissing *all* charges against him.  During the settlement negotiations, AFGE demanded that Gurganious admit that he unlawfully accepted the 6000 AFGE membership emails from James and apologize for doing so.  Gurganious refused, insisting that he did nothing unlawful by requesting, obtaining and using the emails.  Moreover, in the April 1-3, 2019 emails exchanged between the parties' counsel, Gurganious makes clear to AFGE that he informed James he was requesting the emails to use in his and Duggins' 2015 campaign. *(Exh. 3: Goldberg/Axelrod Emails)*.  And knowing he intended to use them for campaign purposes, James gave Gurganious the emails to use however he chose *without* labeling them confidential or proprietary and *without* encrypting them with password protection.   If the Court finds that the 6,600 emails were a trade secret, which it should not, AFGE has not established that James, Gurganious, Duggins or Hudson met the statutory definition of misappropriating them.

> To establish a trade secret misappropriation claim under the DCUTSA, [AFGE] must allege: (1) the existence of a trade secret; and (2) **acquisition of the trade secret by improper means, or improper use or disclosure by one under a duty not to disclose**. *DSMC, Inc. v. Convera Corp.*, 479 F. Supp. 2d 68, 77 (D.D.C. 2007) (citing D.C. Code § 36-401). The "threshold inquiry" in every trade secret case is "whether or not there [is] a trade secret to be misappropriated." *Catalyst & Chemical & Chemistry Services, Inc. v. Global Ground Support*, 350 F. Supp. 2d 1, 8 (D.D.C. 2004). "For information to constitute a trade secret under the DCUTSA, (1) the information must be secret; (2) its value must derive from its secrecy; and (3) its owner must use reasonable efforts to safeguard its secrecy." *DSMC, Inc.*, 479 F. Supp. 2d at 77-78 (internal quotation

marks and citation omitted). "Whether a particular piece of information is a trade secret is generally a question of fact [for determination by the jury]." *Id.*

James, Gurganious, Duggins, and Hudson did not acquire the emails by improper means nor did they have a duty not to disclose them.  AFGE authorized James to access, download, a "with a few keystrokes" download and disseminate the emails. The 2013 *Dimondstein* decision had issued two years earlier requiring AFGE to provide Gurganious with the emails he requested. And AFGE admits that in June 2015 the union had not yet established a written policy allowing candidates to obtain the email addresses of AFGE members through the True Ballot system – because, as AFGE admits, that system was not established until December 2017.  If, as he claims, Gurganious informed James he intended to use the Membership Database in his and Duggins' 2015 campaigns for office, James may have honestly believed that she was required by *Dimondstein* to provide the Membership Database to Gurganious for those purposes. The issue of whether James believed that she was authorized by AFGE and required by *Dimondstein* to provide the 6000 AFGE members' emails to Gurganious for legitimate business reasons is a question for the jury to decide and not the Court at the summary judgment phase.

Regarding AFGE's claims that James violated the PII Policy by providing Gurganious with emails that contained the last four digits of the members' SSNs, AFGE admits that when James gave Gurganious the emails, the union had not yet "scrubbed" its Membership Database of the personal identifying information (last four digits of the SSN) of its members.  The AFGE General Counsel attested that AFGE began "scrubbing" the emails of the last four digits of the SSN in December 2017.  Thus, Membership Database emails containing the last four digits were the only emails available to her when James provided them Gurganious and other AFGE candidates and elected officials.  A jury may reasonably ask if AFGE contends that Gurganious and James knowingly breached AFGE's PII and Computer Usage policies when James provided

the emails to Gurganious, as AFGE claims, without authorization and in violation of those policies, why didn't AFGE take disciplinary action against Gurganious who was an AFGE elected official and AFGE member in August 2018 after AFGE determined that Gurganious allegedly misappropriated AFGE's trade secrets, converted AFGE's property, and violated his fiduciary duties as an AFGE elected officer?   During the parties' August 2018 settlement discussions, Gurganious vindicated Hudson of AFGE's charges of conversion, misappropriation of trade secrets, and breach of his union duties by informing AFGE that without Hudson's knowledge or  encouragement, three years earlier,  in June 2015, Gurganious had lawfully obtained the disputed emails from AFGE official Cara James.  Instead of dismissing the  false charges against Mr. Hudson contained in its original complaint filed in this case, AFGE amended its complaint in September 2018 with the knowingly false charges that Mr. Hudson **stole** (or encouraged Gurganious and Duggins) the Gurganious emails following his November 2017 reinstatement by the Court as NST and used them in his and Duggins' 2018 campaign.  At this point, AFGE admits, as AFGE demanded, Hudson, Duggins, and Gurganious had returned to AFGE (or destroyed) the 5,500 Gurganious emails in August 2018. AFGE SUMF ¶ 58. The election was over, and AFGE acknowledged that the email issue was likely mooted.  Yet, AFGE perpetrated this false narrative with the aim of defaming Mr. Hudson.

Nearly four years later, AFGE now continues to describe as "trade secrets" those same Gurganious emails that AFGE widely distributed to Gurganious and nearly 1,000 other AFGE staff members and elected Local, Council, and National officials who were authorized to access the AFGE Membership Database. And despite granting so many AFGE officials access to the database, AFGE failed to provide them with the written "PII policy"  or to train them on its use.

*(Exh. 2: Hudson Decl.).* As a result, AFGE official Anthony Livingston, who worked in another department altogether than Cara James, also felt completely comfortable sharing the purportedly "secret" Membership Database by emailing it from his nonencrypted, public AFGE email address to AFGE Council official Felicia Sharp without any disclaimers or restrictions as to their use.  Feeling the same comfort level as James and Livingston, Sharp reforwarded them to Hudson, again, from her non-encrypted AFGE email address with no restrictions on their use. AFGE cannot dispute these material facts, and based on them, the Court should dismiss AFGE's claim that Hudson misappropriated AFGE trade secrets, or, in the alternative deny the motion for summary judgment.

## III.  The Court should deny summary judgment on AFGE's conversion claim, or in the alternative, dismiss the conversion claim as moot.

Conversion requires "(1) an unlawful exercise, (2) of ownership, dominion or control, (3) over the personal property of another, (4) in denial or repudiation of that person's rights thereto." *Johnson v. McCool,* 808 F. Supp. 2d 304, 308 (D.D.C. 2011) (citation omitted).  Because Hudson, Duggins, and Gurganious returned (or destroyed) the emails in August 2018 as AFGE demanded, AFGE's  September 2018 conversion claim in the amended complaint must be dismissed as moot.  In the alternative, since disputed material facts exist as to whether Hudson was initially in lawful possession of the James and Sharp Spreadsheets, the Court should deny summary judgment on AFGE's conversion claim.

### A.  Hudson was initially in lawful possession of the information contained in the spreadsheets.

"[W]here the initial possession is lawful, a demand for return of the property is necessary to establish a claim of conversion." *Id.* at *22 (*De Lupis v. Bonino,* Case No. 07-01372 (RBW) 2010 U.S. Dist. LEXIS at *22, D.D.C. March 31, 2010 citing *Furash & Co. v. McClave,* 130 F. Supp. 2d 48, 58 (D.D.C. 2001) (citations omitted).

1.      The James Spreadsheet

As fully explained *supra*, James lawfully obtained the James Spreadsheet. James then lawfully sent the James Spreadsheet to Gurganious in 2015, who then lawfully used the information in the James Spreadsheet to assist Duggins in her 2015 campaign for National President. In 2017, Gurganious lawfully sent the James Spreadsheet to Duggins and Hudson for use in their joint campaign for national elected office. Hudson was not made aware of the source of the James Spreadsheet until February 2018. At no point in time was either the acquisition or distribution of the James Spreadsheet unlawful.

Additionally, it was not until AFGE filed the instant lawsuit in May 2018 that Gurganious and Hudson became aware that AFGE was claiming the James Spreadsheet was AFGE property and that the spreadsheet contained personally identifiable information. Gurganious Dep. 108: 14-15. Gurganious, Hudson, and Duggins perceived the information in the James Spreadsheet as "just email addresses, and so it wasn't really a big deal to us." Gurganious Dep. 108: 16-1. According to Gurganious, "That's why I didn't password protect it or do anything like that. So it wasn't a big deal to us, because we perceived it as nothing but a list for email addresses." Gurganious Dep. 108: 16-20. Because both Gurganious and Duggins had used the email address information in the James Spreadsheet for Duggins's election campaign in 2015, when Hudson used the same email address information in his joint campaign with Duggins in 2017 and 2018, he did not think there was anything wrong with doing so. Hudson stated, "[T]o my knowledge, there's no prohibition against you using E-mails or a list that you were given on a previous election. I don't know of any policy that says that it is." Hudson Dep. 145: 5-10.

In the amended complaint, AFGE admits that "Gurganious provided the Gurganious Emails to Duggins in connection with her campaign for AFGE office in 2015" and "Gurganious and/or Duggins then provided the same information to Hudson in connection with

his most recent campaign for AFGE office."  AFGE's admission refutes its assertion that

Hudson "stole" the emails or encouraged Duggins and Gurganious to steal them.  AFGE's

admission establishes that Hudson obtained the emails from Gurganious after Gurganious

obtained them from James and used them in the 2015 campaign, with AFGE's authorization

and without AFGE's objection.  Thus, the Court should dismiss the conversion count, or, in the

alternative, deny AFGE's motion for summary judgment leaving the question of whether

Defendant committed conversion for the jury to decide.

    2.  The Sharp Spreadsheet

   In or around February 2017, Anthony Livingston, an AFGE staff member in the

Legislative and Political Department, sent to Felicia Sharp a spreadsheet containing data

concerning approximately 256 AFGE Members, including their email addresses ("Sharp

Spreadsheet"). At that time, Sharp was "the AFGE Local 1014 President and the Council 1 2nd

Vice President." AFGE SUMF ¶ 40; Higley Dec'l. ¶ 53, Exh. 13 to AFGE's SUMF ¶ 40.

According to AFGE, "Since February 2015, Livingston has had AFGE credentials with access

permission for the AFGE Member Database because his job duties require him to access

information on the AFGE Member Database for official AFGE business." AFGE SUMF ¶ 40.

On August 11, 2017, Sharp sent the Sharp Spreadsheet to Hudson. AFGE SUMF ¶ 39. After

Hudson received the Sharp Spreadsheet, he forwarded it to Devlin Hillman. Hillman created an

account with iContact, a third-party vendor who imported the information in the Sharp

Spreadsheet into its database and managed the email list for Hudson and Hillman. Hillman Dep.

50: 5-6, 13-21; 51: 20-25.

   As Hudson testified at his deposition, he was not aware of any AFGE policy prohibiting

him from using e-mails or lists in his 2017-2018 campaign for AFGE President that were used in

previous elections. Hudson Dep. 145: 5-10. AFGE enacted a PII policy on December 21, 2016. Because that policy was not in place in 2015, James could not be said to have violated that policy. Thus, James's access to AFGE's member database and her subsequent transmission of the information in the James Spreadsheet to Gurganious in 2015 was lawful. AFGE admits that Livingston had lawful access to the AFGE member database when he sent the information in the Sharp Spreadsheet to Sharp in February 2017. AFGE SUMF ¶ 40. Because AFGE did not have any written policies which were accessible to its membership, Hudson was not aware that his using the email information contained in the James and Sharp Spreadsheets violated any AFGE policies—especially since Gurganious and Duggins had used the same email information in Duggins's 2015 campaign for AFGE National President.

>    **B.     Because Hudson was initially in lawful possession of the information in the James and Sharp Spreadsheets, it was incumbent upon AFGE to demand that Hudson return the information—which he did.**

"[W]here the initial possession is lawful, a demand for return of the property is necessary to establish a claim of conversion." *Id.* at *22 (*De Lupis v. Bonino,* Case No. 07-01372 (RBW) 2010 U.S. Dist. LEXIS at *22, D.D.C. March 31, 2010, citing *Furash & Co. v. McClave,* 130 F. Supp. 2d 48, 58 (D.D.C. 2001) (citations omitted). If the initial possession of the property is unlawful, "a demand is not necessary as the adverse nature of the possession would appear self-evident." *Id.* at *24 (citing *Shea v. Fridley,* 123 A.2d 358, 361 (D.C. Cir. 1956)).

There is nothing in the record in the case at bar which would indicate that Hudson's possession of the information contained in the James and Sharp Spreadsheets was self-evidently adverse to AFGE. As more fully explained *supra,* Hudson was not aware of any AFGE policies which prohibited him from using the email information contained in the James and Sharp Spreadsheets for his 2017-2018 campaign for AFGE National President—especially since

Gurganious and Duggins used the same information for Duggins's campaign for AFGE National President in 2015. Gurganious was not aware of any PII policies prohibiting him, Duggins, or Hudson from using the email information—until AFGE filed the instant lawsuit in May 2018 claiming they had engaged in wrongdoing by using the email information for their campaigns. Gurganious Dep. 108: 13-20. According to Gurganious, he, Duggins, and Hudson considered the information to just be "email addresses." Gurganious Dep. 108: 16. It was plainly not "self-evident" to Hudson that his use of the email addresses contained in the James and Sharp Spreadsheets was adverse to AFGE.

It is undisputed that AFGE enacted a PII policy for the first time on December 21, 2016. Because that policy was not in place in 2015, James could not be said to have violated the PII policy. Thus, James's access to AFGE's member database and her subsequent transmission of the information in the James Spreadsheet to Gurganious in 2015 was lawful.  AFGE admits that Livingston had lawful access to the AFGE member database when he sent the information in the Sharp Spreadsheet to Sharp in February 2017. AFGE SUMF ¶ 40. Sharp, having lawfully received the information from Livingston, then lawfully sent that information to Hudson.

Because Hudson's initial possession of the information contained in the James and Sharp Spreadsheets was lawful, *Furash & Co. v. McClave,* 130 F. Supp. 2d 48, 58 (D.D.C. 2001) instructs that the D. C. conversion statute *required* AFGE to first make a demand upon Hudson to return this information to AFGE. AFGE claims it "requested that Hudson return all AFGE data to AFGE" when he was terminated in 2018[1]. AFGE SUMF ¶ 57. But AFGE did not at that time make a specific request upon Hudson to return the James and Sharp Spreadsheets. In fact, when he was terminated, Hudson believed that the information in the spreadsheets did not belong

---

[1] AFGE terminated NST Hudson for the second and final time on January 12, 2018 – and not in February 2018 as AFGE claims.

to AFGE, since he had received the information from Duggins and Sharp—not AFGE. Hudson Dep. 142: 12-15; 145: 18-20. Hudson denied that the information is AFGE's property, since "Dana [Duggins] received that information in 2015, the same as all other candidates." Hudson Dep. 142: 9-24.

On June 29, 2018, AFGE filed a motion for a preliminary injunction against Defendants Hudson and Duggins to stop them from using the Membership Database in their 2018 AFGE campaign.  AFGE claimed "they misappropriated from AFGE in violation of the Computer Fraud and Abuse Act, the Labor Management Reporting and Disclosure Act, the Uniform Trade Secrets Act and the common law of the District of Columbia." [ECF 9].  Shortly after filing the motion, AFGE indicated an interest in settling all claims against all three defendants.

On July 11, 2018, U. S. District Court Judge Ketanji Brown Jackson issued a Minute Order finding that the parties had "indicated their interest in conferring to discuss the potential of a non-litigation resolution of the issues in the case."  According to AFGE, "Hudson did not return the James Spreadsheet or the Sharp Spreadsheet to AFGE until August of 2018, months after AFGE filed this action and pursuant to an agreement between counsel aimed at resolving AFGE's Motion for Preliminary Injunction." AFGE SUMF ¶ 58. The Agreement referenced by AFGE is the Parties' Joint Status Report in 18-01230 (ECF 14 filed on July 16, 2018), which was subsequently revised by the Parties and filed on July 17, 2018 (ECF 15-2). In the Revised Joint Status Report, the Parties advised the Court that the Defendants "will cease using in any format or in any service mechanism the names derived from the 2015 spreadsheet on the earlier of the following dates: (a) August 13, 2018; or (b) the date AFGE provides to Defendants Hudson and Duggins the delegate information required by Appendix A, Part II, Section 4(b) of

the AFGE Constitution and required by *Dimondstein v. Am. Postal Workers Union,* 964 F. Supp. 2d 37 (D.D.C. 2013)." ECF 15-2 at 4.

After the Parties filed the Revised Joint Status Report, this Court stayed "any consideration of the pending preliminary injunction motion or the underlying case" because the status reports filed by the Parties "contain a number of conditional offers from both parties and does not clearly indicate that the parties have settled on a course of action for moving forward." Court's Minute Order Entered on July 18, 2018. On August 10, 2018, AFGE filed a Motion to Life Stay, claiming that the Defendants failed "to comply with their promise to cease using AFGE data." ECF 17 at 3. AFGE contended that, "[b]y promising to substantially comply with the relief sought in the PI Motion, Defendants were able to convince the Court that the PI Motion was effectively mooted." ECF 17 at 4. The Court denied AFGE's Motion to Lift Stay on August 13, 2018, and entered a Minute Order stating, "This Court did not stay its consideration of Plaintiff's preliminary injunction motion based on a finding that the motion was moot; rather, the Court made the prudential determination that the motion could not be fully or fairly evaluated given the parties' ongoing negotiations and perpetually shifting positions." Court's Minute Order dated August 13, 2018. The Court ordered the Parties to file a joint status report which "reflects the parties' final, unconditional litigating positions regarding the claims at issue…." *Id.* The Parties filed another Joint Status Report on August 20, 2018, stating among other things:

> To clarify each party's position on the claims at issue in light of disclosures received from Defendants' counsel and to address events that have taken place since the conference with the Court held on July 11, 2018, the Parties respectfully request that the Court enter the attached proposed order approving the following schedule: Plaintiffs will file an amended complaint on or before September 4, 2018; Defendants will answer or otherwise respond to the amended complaint on or before September 18, 2018; and Plaintiff will withdraw its pending motion for a preliminary injunction without prejudice.

Joint Status Report, ECF 18 at 1-2. On August 23, 2018, the Court entered a Minute Order, "adopting the parties' proposal for further proceedings." Judge Jackson denied Plaintiff's Motion for Preliminary Injunction without prejudice as moot." Minute Order dated September 18, 2018. Additionally, during the hearing on the motion for a preliminary injunction before U. S. District Court Judge Ketanji Brown Jackson, AFGE acknowledged that its preliminary injunction was likely mooted following the August 2018 AFGE National Convention.

AFGE admitted that Hudson returned to AFGE (or destroyed) the 5,500 Gurganious emails in August 2018 as AFGE demanded. AFGE SUMF ¶ 58. Yet, after learning this allegation was false, AFGE s*till* claimed that Hudson converted AFGE's membership list in its September 2015 amended complaint. Amended Comp'l ¶¶ 128-139. AFGE asked the Court to permanently enjoin the Defendants "from obtaining or using any AFGE property, including, but not limited to, AFGE's Member Database and any membership lists." Amended Comp'l at 24. An action for conversion cannot lie when the possession of property in question was initially lawful, a demand was made for the return of the property, and the property was returned. Accordingly, AFGE's September 4, 2018 claim against Hudson for conversion of its property and its request to permanently enjoin Hudson must be dismissed as moot. "[A]s applied to intangible **property**; our jurisprudence has sharply limited the possible availability of that tort [conversion] to types of documents of intrinsic value not presented here." *Greenpeace, Inc. v. Dow Chem. Co.*, 97 A.3d 1053, 1064 (D.C. Cir. 2014) (citations omitted). "Conversion is a tort based on the theory that the defendant 'has in some way treated the goods as if they were his own, so that the plaintiff can properly ask the court to decree a forced sale of the property.'" *Id.* (citing *Pearson v. Dodd*, 410 F.2d 701, 706 (D.C. Cir. 1969)). "Whatever

other protections the law may offer to protect intangible property rights, the common-law tort of conversion is generally ill-suited to that end." *Id.* Because the membership information contained in the James and Sharp spreadsheets (which represent a mere 2% of the Membership Database) is not, in and of itself, of intrinsic value, it is not possible for this Court to order Hudson to sell the membership information. The James and Sharp spreadsheets are exactly the types of documents which the common-law tort of conversion is ill-suited to remedy. The Court should dismiss the conversion claim. In the alternative, this Court should deny Plaintiff's motion for summary judgment on its conversion claim because there are disputed issues of material fact regarding that claim.

## IV.    This Court should dismiss or deny summary judgment on AFGE's claims that Hudson violated his fiduciary duties to AFGE and dismiss all claims against him.

If the Court does not dismiss the LMRDA 501 count on the grounds of judicial estoppel, the Court should deny AFGE's motion for summary judgment because material issues of fact exist regarding AFGE's claim that Hudson "converted" or "misappropriated" AFGE's property. These are the only remaining counts because the Court dismissed with prejudice AFGE's federal computer fraud claims.

AFGE asserts that Gurganious used the Membership Database obtained from James in 2015 approximately three times to send campaign literature to potential AFGE voters over the course of about a month of promoting Duggins 2015 campaign. AFGE SUMF ¶33. AFGE claims that these were the first emails sent to AFGE members from candidates for AFGE office to promote their campaigns but has offered no evidence to support that claim. Prior to this, AFGE admits, campaign communications were done by regular mail or phone calls. AFGE SUMF ¶34. Yet, to date, AFGE has taken no disciplinary action against Gurganious, an AFGE member, after determining that he unlawfully used the emails obtained from James in his and Duggins' 2015

AFGE election campaign.  And AFGE admitted in 2017 that in the past, AFGE staff  routinely

emailed the Membership Database to other candidates for office. In approximately 2016, AFGE

began to regularly send emails to all 300,000 AFGE members in what it terms an "email blast."

In August 2016, Defendant Hudson requested the first of two sets of mailing labels from AFGE

to distribute his campaign materials to AFGE members ahead of the August 2018 AFGE national

election.  AFGE promptly provided the first set of mailing labels to Mr. Hudson in August 2016.

In January 2017,  as required by *Dimondstein*, Mr. Hudson requested in writing that AFGE

provide him with access to AFGE emails, at his cost, to send campaign materials ahead of the

August 2018 AFGE National election.  AFGE refused his request.  AFGE asserts:

> Candidates for AFGE national office may utilize the Member Database only through a
> defined process AFGE administers. SUMF ¶10. Candidates are not given the full
> database or even portions of the database. *Id.* Rather, candidates may utilize
> information from the database in two ways. First, they may pay for mailing labels that
> can be used to send campaign literature via regular mail. *Id.* Second, beginning in 2018,
> candidates were permitted to pay a fee and use a third-party email vendor (approved by
> AFGE) to send campaign information to members. *Id.*

Mot. S.J. at 9. Two of these statements are inaccurate.  First, AFGE provides the first set of

mailing labels to candidates **at no cost**.  AFGE Candidates are required to pay only for additional

sets of mailing labels.  And it was in April 2017 (and not 2018) that for the first time in AFGE

history, AFGE provided candidates for the position of AFGE National Vice President (NVP)

with access to the AFGE Membership Database of emails (Membership Database) as required by

*Dimondstein* at his or her expense for the then-upcoming Spring 2017 election of national vice

presidents [Declaration of AFGE General Counsel David Borer, December 20, 2017 (Borer

Decl.), at p. 2]  Despite DOL regulations requiring them to do so, AFGE continued to refuse Mr.

Hudson's January 2017 request for access to the emails. To hamper his campaign, AFGE

intentionally delayed until January 2018 before providing Hudson and Duggins with access to

the emails, at their cost, finally authorizing Defendants' use of the Member Database for campaign purposes.  AFGE admits that the Membership Database may be used to promote internal AFGE political campaigns. AFGE concedes that its employee, Cara James, provided emails from the Membership Database to Gurganious without restrictions on its use.  AFGE acknowledges that Gurganious used the emails in his and Duggins' 2015 AFGE elections without objection from AFGE.  AFGE admits that Gurganious then provided the same emails to Duggins and Hudson for use in their joint 2018 AFGE campaigns.  AFGE admits that it dismissed all counts filed against Gurganious and Duggins in this case.  Yet, despite those admissions, AFGE now asks this Court to grant summary judgment on its claim that Hudson violated his fiduciary duty under Section 501 of the Labor-Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 501 by "converting" and misappropriating the same Membership Database that AFGE lawfully provided to him, through James, Gurganious and Duggins, to promote his 2018 AFGE political campaign. The Court should deny the motion. Since James was authorized to access the Membership Database as part of her official AFGE duties, in 2015, James lawfully provided the Membership Database to Defendants Gurganious, Duggins, and Hudson (all of whom were elected officials, and who, AFGE concedes, were authorized by AFGE to access the Membership Database). Since James, Gurganious, Duggins, and Hudson were all authorized by AFGE to access and use the Membership Database in their capacities as elected officials, they did not violate trade secrets by using the Membership Database in their AFGE campaigns because AFGE admits that the union, through its official Cara James, freely provided the Membership Database to Gurganious in 2015 without any disclaimers or restrictions on its use.  And Gurganious, in turn,  provided it to Defendants Duggins and Hudson for use in their 2018 campaign without any restrictions. AFGE offers the deposition testimony of David Cann who testified that he supervised Cara

James and that James was a disgruntled employee who provided the emails to Gurganious without Cann's knowledge or authorization.  AFGE has not established the truthfulness of that assertion--which is a material disputed fact for the jury to determine and not one for the Court to decide at the summary judgment phase.  However, as previously stated, James was under a PIP at the time.  If Cann was aware that James was "disgruntled," Cann was already closely supervising James under the PIP.  He had a duty to closely monitor her computer activity and curtail her access to the Membership Database. Cann failed to do so.

Under the express terms of the AFGE Constitution, the ultimate authority and responsibility for supervising all AFGE headquarters personnel, including Cara James, David Cann, and Anthony Livingston, reside with the National President, the union's highest-ranking officer.  The term "inadequate supervision" indicates, as the Saunders decision makes clear, that to make out a claim under Section 501 alleging "inadequate supervision" against union officers who do not themselves stand accused of impropriety, a plaintiff must point to some provision(s) in the union's constitution or other governing documents "impos[ing]" on the union officer's specific "oversight" (i.e., supervisory) "responsibilities. and duties" of union officials (like James and Livingston) who do stand accused of impropriety.  Saunders v. Hankerson, 312 F. Supp. 2d 46, 78-79  (D.D.C. 2004).

In adopting the  "inadequate supervision" theory of Section 501 liability, the Saunders court cited Dunlop-McCullen v. Pascarella, No. 97Civ.0195(PKL)(DFE), 2002 WL 31521012 (S.D.N.Y. Nov. 13, 2002), in which the district court held that the plaintiff stated a Section 501 claim against a union president based on the allegation that the president failed adequately to supervise a corrupt bookkeeper over whom the president had supervisory authority and "responsibility" under the express terms of the union's constitution.  See id. at *16.  The Sanders

court ruled that the plaintiff had stated a Section 501 "claim of inadequate supervision" against the individual members of the union's board of trustees based on the allegations that the union's treasurer was intimately involved in the financial wrongdoing at issue; that the union's constitution expressly gave the board of trustees substantial "oversight powers" over the treasurer's financial activities; and that the board members had nonetheless "contented themselves with rubber stamping [the treasurer's] annual budget." Saunders, 312 F. Supp. 2d at 51-52, 78-79. For all times relevant to these proceedings, NST Hudson did not supervise Cara James or Anthony Livingston, President J. David Cox did.  Thus, AFGE should have sued Cox for violating his Section 501 fiduciary duties to the union by inadequately supervising James, not Hudson.  AFGE also complains that AFGE official Anthony Livingston improperly forwarded a portion of the Membership Database at issue to AFGE Council official Felicia Sharp without authorization and Sharp reforwarded it to Hudson.  AFGE SUMF ¶ 40.  Cox was Livingston's ultimate supervisor, not Hudson.  The AFGE Constitution grants to National President Cox the unilateral and sole authority to summarily discipline prior to a hearing AFGE Local and Council elected officials, including Felicia Sharp, for violating the Constitution.   If AFGE determined that Livingston and Sharp violated the AFGE Constitution by emailing purportedly "trade secret" portions of the Membership Database to Eugene Hudson on August 11, 2017, AFGE should have filed a lawsuit against Cox for violating his Section 501 fiduciary duty, not Hudson.  Instead, AFGE filed this lawsuit against Hudson just before the 2018 AFGE election at Cox's direction for purely political reasons to discredit Cox's opponent in the upcoming election.

## CONCLUSION

The three remaining counts are the sole federal count under LMRDA Section 501 and the two state claims of conversion and trade secret misappropriation.  As required by *Furash*,

AFGE demanded that Defendants return the emails to AFGE or destroy them.  Defendants complied with that demand in August 2018, before AFGE filed the amended complaint in this case.  Thus, the conversion count should be dismissed as moot.  As for the remaining counts, there are many material facts in dispute regarding them.  The Court should deny AFGE's motion for summary judgment because it is nothing more than an effort to obfuscate the facts, prolong this groundless litigation, and, if the case is not allowed to proceed, keep those facts away from the jury. Because a reasonable jury could find that Hudson did not misappropriate AFGE's trade secrets, that Hudson did not convert AFGE's Member Database, and that Hudson did not violate his Section 501 fiduciary duties toward AFGE, this Court should deny AFGE's summary judgment motion and allow this matter to proceed to the jury on its merits.

Alternatively, for the reasons stated above, the Court should dismiss the conversion count as moot and dismiss the other counts because AFGE dismissed all counts filed against Mr. Hudson's co-defendants, Gurganious and Duggins, more than two years ago.  During a recent conference, the Court granted Defendant the right to file a motion to dismiss Plaintiff's complaint. If the Court declines to dismiss Plaintiff's complaint, Defendant asks the Court for leave to file a more substantive motion to dismiss following the Court's ruling on Plaintiff's dispositive motion.

Respectfully submitted,

/s/ Marlene (Kemi) Morten
Marlene (Kemi) Morten, D.C.
Bar No. 272575
3825 South Capitol Street , S.W.
Washington, DC 20032
(202) 379-4806/(202) 492-5963
Kemi.morten@gmail.com
*Counsel for Plaintiff*

Date: June 30, 2022